FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION

16 JAN -5 AM 11: 44

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS, FLORIDA

UNITED STATES OF AMERICA,
and THE STATE OF FLORIDA,

ex rel. MARGARET PETERS, R.N.,

PLAINTIFFS AND RELATOR,

v.

HOPE HOSPICE AND COMMUNITY
SERVICES, INC., f/k/a HOPE OF
SOUTHWEST FLORIDA, INC., f/k/a H.O.P.E.
OF LEE COUNTY, INC. d/b/a HOPE
HEALTHCARE SERVICES; VISITING
NURSES ASSOCIATION OF SOUTHWEST
FLORIDA, INC.; FLORIDA PACE
ASSOCIATION, INC.; HOPE MEMORIAL
CARE, INC.; and SAMIRA BECKWITH ,

DEFENDANTS.

CIVIL ACTION NO.

2: 16 -CV- ___ -FtM-99 M|2M

FALSE CLAIMS ACT
COMPLAINT AND DEMAND
FOR JURY TRIAL

FILED IN CAMERA
AND UNDER SEAL

Margaret Peters, R.N. ("Relator") brings this action on behalf of the United States of America ("United States") and the State of Florida for treble damages and civil penalties arising from the conduct of Defendants Hope Hospice and Community Services, Inc., f/k/a Hope of Southwest Florida, Inc., f/k/a H.O.P.E. Of Lee County, Inc. d/b/a Hope Healthcare Services (collectively "Hope Hospice" or "HH"), Visiting Nurses Association Of Southwest Florida, Inc., Florida Pace Association, Inc., Hope Memorial Care, Inc., and Samira Beckwith ("SB") in violation of the Federal Civil False Claims Act, 31 U.S.C. § 3729, et seq. ("FCA"). The violations arise out of false claims for payment made to Medicare, Medicaid, TRICARE, f/k/a CHAMPUS and CHAMPUSVA, Federal Employees' Health Benefits Program and other

1

federally funded government healthcare programs (hereinafter, collectively referred to as "Government Healthcare Programs"). This action is also brought under the *qui tam* provisions of the Florida False Claims Act on behalf of the State of Florida.

## I.   BACKGROUND

1.      "Hospice care is an approach to caring for the terminally ill individual that provides palliative care rather than traditional medical care and curative treatment. Palliative care is an approach that improves the quality of life of patients and their families facing the problems associated with life threatening illness through the prevention and relief of suffering by means of early identification, assessment and treatment of pain and other issues. Hospice care allows the patient to remain at home as long as possible by providing support to the patient and family, and by keeping the patient as comfortable as possible while maintaining his or her dignity and quality of life. Hospice uses an interdisciplinary approach to deliver medical, social, physical, emotional, and spiritual services through the use of a broad spectrum of caregivers." Federal Register / Vol. 73, No. 109. http://www.gpo.gov/fdsys/pkg/FR-2008-06-05/pdf/08-1305.pdf. 42 C.F.R. §418 *et seq.*

2.      Under the Social Security Act (42 U.S.C. §§ 1302 and 1395hh, *et seq.*), "An individual is 'terminally ill' if he or she has a medical prognosis that the individual's life expectancy is 6 months or less." 42 U.S.C. § 1395x(dd)(3)(A). This definition is further clarified at 42 C.F.R. §418.3 to provide for a life expectancy of 6 months or less "if the illness runs its normal course."

3.      Hospice benefits have been included under Medicare Part A since 1982, covering a range of services from pain management, bereavement counseling to a range of other palliative care services to patients who have a terminal illness and have opted to forgo curative treatment.

2

The focus is on making a patient and his family as comfortable as possible in the final months of life.

4.      Hospice is a multibillion-dollar nationwide industry, with extraordinary growth rates over the last decade.  Medicare payments to hospice programs have increased from approximately $3 billion in 2000 to $15 billion in 2013.

5.      The percentage of hospice patients covered by the Medicare hospice benefit versus other payment sources was 87.2% in 2013.  The percentage of patient days covered by the Medicare hospice benefit versus other sources was 91.2%.[1]

6.      Hope Healthcare Services is and has been owned and operated by SB for more than twenty years.  Hope Hospice operates through its various components in many Florida communities including Charlotte, Collier, DeSoto, Glades, Hendry, Lee and Sarasota Counties.[2]

7.      Hope Hospice has been a licensed home health agency, providing hospice health care and support for the terminally ill.  Services included nursing and home health services as well as continuing emotional and practical support provided by trained professionals in social work, counseling and bereavement.  Hope Hospice also operates multiple *inpatient* facilities which they call "Care Centers."[3]

8.      Over the years, Hope Hospice has seen dramatic growth, and has litigated against opposition to protect its growing "service" area.  SB has grown Hope Hospice from providing

---

[1]  http://www.nhpco.org/sites/default/files/public/Statistics Research/2014 Facts Figures.pdf

[2]  Programs include "Hope Comfort Care" in Charlotte, Collier, Glades, Hendry and Lee Counties; "Hope Connections" in Glades and Hendry Counties, "Hope Hospice" in Glades, Hendry and Lee, "Hope Pace" in Charlotte, Collier and Lee and "Hope Visiting Nurses" in Charlotte, Collier, DeSoto, Hendry, Lee and Sarasota Counties.
https://www.hopehospice.org/OfficeLocations/

[3]  Joanne's House at Bonita Springs, 27200 Imperial Parkway, Bonita Springs, FL 34135; Hope Care Center at Cape Coral, 2430 Diplomat Parkway, Cape Coral, FL 33909; Hope Care Center at HealthPark, 9470 HealthPark Circle, Fort Myers, FL 33908; and Hope Care Center at Lehigh Acres, 1201 Wings Way, Lehigh Acres, FL 33936.

services to one hundred patients to a health care conglomerate currently charging government healthcare programs for more than two thousand individuals.[4]

9.      As alleged herein, for more than seven years, Defendants have caused thousands of false claims to be made on federal health care programs, primarily Medicare. Defendants accomplished this by knowingly admitting and retaining patients who did not meet federal and state eligibility criteria for hospice benefits. Hope Hospice knowingly admitted and retained patients who were not "terminally ill;" provided general inpatient services (GIP) that were billed at the highest reimbursement rates that were not medically necessary and that failed to meet federal and Florida inpatient criteria; and falsified medical documents and patient records including "Recertification Summaries" and other patient care records. The resulting false claims caused the government to pay out funds that they otherwise would not have paid and unlawfully enriched Defendants.

10.      Based on her four years of experience as Director of Hospice Care at Hope Hospice, Relator estimates that a large percentage of the general hospice census is not eligible for hospice services and that an examination of patient records will reveal missing authorizations and inadequate documentation. Relator believes that at any given time during her employment by Hope Hospice, about 40% of all GIP patients (billed at the highest hospice reimbursement rates) are not eligible to receive in-patient services under federal and state guidelines.

## II.      FEDERAL JURISDICTION AND VENUE

11.      The acts proscribed by 31 U.S.C. § 3729 *et seq.*, and complained of herein occurred in the Middle District of Florida, and primarily in Lee County, Ft. Myers, Florida. Other involved Counties are also within this District and all except one are located within the Ft.

---

[4]  https://www.hopehospice.org/leadership/

4

Myers Division: Charlotte, Collier, DeSoto, Glades, Hendry, Lee and Sarasota (Tampa Division). Defendants' principal office is located at 9470 Healthpark Circle, Fort Myers, Florida 33908. The registered agent for service of process for the corporate Defendants is Robert J. Griffin at the same address. The acts alleged in this complaint were committed in this district. Therefore, this Court has jurisdiction over this case pursuant to 31 U.S.C. § 3732 (a), as well as under 28 U.S.C. §1345.

12.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because Defendant does business in Lee County, Florida. The Defendants transact business in the Middle District of Florida and all of the acts and omissions proscribed by 31 U.S.C. §3729 *et seq.,* occurred in the State of Florida.

13.     Samira Beckwith is a resident of the district residing at ███████████ ███████████████████████

14.     This court has jurisdiction over the subject matter of this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331 and has personal jurisdiction over Hope Hospice and its related entities named herein because they do business in the Middle District of Florida. The Ft. Myers Division is the appropriate Division of this Court to hear a case involving these Defendants.

15.     The facts and circumstances alleged in this complaint have not been publicly disclosed in a criminal, civil or administrative hearing, nor in any congressional, administrative, or government accounting office report, hearing, audit investigation, or in the news media.

16.     Relator is an "original source" of the information upon which this complaint is based, as that term is used in the False Claims Act.

### III.   PARTIES

17.     The United States funds the provision of medical care through Government Healthcare Programs such as Medicare, Medicaid, Federal Employees' Health Benefits Program, TRICARE/CHAMPUS, CHAMPVA, and other agencies and programs, acting through the Centers for Medicare & Medicaid Services ("CMS") within the U.S. Department of Health and Human Services ("HHS"), the Department of Defense, and other federal agencies.

18.     The State of Florida funds a portion of Medicaid services and other healthcare services utilized by Hope Hospice patients.

19.     Relator Margaret Peters, R.N. is a citizen of the United States and a resident of the State of Florida.  She is a registered nurse in Florida with a B.A. in Health Care Administration. Peters was employed by Defendant Hope Hospice beginning in September 2011 and served as Director of Hospice Care until December 4, 2015.  In that capacity she was in charge of all four Hope Hospice in-patient care facilities with one hundred beds and a staff of 200.  She has been employed in hospice care for over fifteen years.  Relator left Hope Hospice voluntarily and in good standing because of her concerns about the fraudulent admission and retention practices.

20.     Defendant Hope Hospice and Community Services is a Florida for Profit Corporation with hundreds of employees and annual revenue of over thirty million dollars.  It has a current census of about 2000 patients with one hundred general inpatient (GIP) beds at its various hospice care centers.

### IV.   INDIVIDUAL PARTICIPANTS

21.     Samira Beckwith is the Chief Executive Officer and President of Hope Hospice. SB implemented a "liberal" admissions policy which routinely admitted patients who did not meet federal criteria for hospice care and, at the same time, vigorously discouraged required

discharge planning. She intimidated staff into routinely admitting patients inappropriately into GIP, particularly individuals known by staff as "Friends of Samira" (FOS). She frequently told the Relator that "if they are entitled to hospice care they are entitled to GIP care."

22.     Jill Lampley – Chief Financial Officer.

23.     Charlotte King – Chief Human Resources Officer

24.     Bridget Montana – Chief Operating Officer, was Relator's immediate supervisor.

25.     Robert Griffin – Chief Legal Officer

26.     Luis Cortes, the Chief of Medical Services, supports and helps implement SB's improper admission and retention practices. Dr. Cortes has stated to staff in writing that General Inpatient Care is proper if the primary caregiver is unwilling or unable to provide proper care in the home setting. Of course, these are SB's rules – not Medicare's.

27.     Cindy McKay – Executive Assistant to Samira Beckwith

## V.     THE FALSE CLAIMS ACT

28.     The False Claims Act (hereinafter referred to as "FCA"), 31 USC § 3729, was originally enacted in 1865, and was substantially amended in 1986 by the False Claims Amendments Act, Pub.L. 99-562, 100 Stat. 3153. The FCA was further amended in May 2009 by the Fraud Enforcement and Recovery Act of 2009 ("FERA") and again in March 2010 by the Patient Protection and Affordable Care Act ("PPACA"). Both FERA and PPACA made a number of procedural and substantive changes to the FCA in an attempt to ease the burden on the government and Relators in investigating and prosecuting *qui tam* suits under the FCA.

29.     The False Claims Act generally provides that any person who knowingly presents, or causes to be presented, false or fraudulent claims for payment or approval to the United States Government, or knowingly makes, uses, or causes to be made or used false records and

statements material to a false claim, or conspires to engage in such conduct, is liable for a civil penalty ranging from $5,500 up to $11,000 for each such claim, plus three times the amount of the damages sustained by the Federal Government.

30.     The Act allows any person having information about false or fraudulent claims to bring an action for himself or herself and the Government, and to share in any recovery. Based on these provisions, Relator seeks, through this action, to recover all available damages, civil penalties, and other relief for the state and federal violations alleged herein.

31.     This action is also brought pursuant to the Florida False Claims Act, FSA §68.803 which is similar in most regards to the Federal False Claims Act.

## VI.   FEDERAL HEALTHCARE PROGRAMS

32.     In 1965, Congress enacted Title XVIII of the Social Security Act (known as "Medicare" or the "Medicare Program") to pay for the cost of certain medical services and care. Entitlement to Medicare is based on age, disability or affliction with certain diseases.  See 42 U.S.C. §§1395 to 1395ccc.  Outpatient prescription drugs are covered under Parts A-D of the Medicare Program.

33.     In 1965, the Federal Government also enacted the Medicaid program.  Medicaid is the nation's medical assistance program for the needy, the medically-needy aged, blind, and disabled and families with dependent children.  42 U.S.C. §§ 1396-1396v.  Medicaid is largely administered by the states and funded by a combination of federal and state funds.  The State of Florida contributes roughly one-half of Medicaid funding with the federal government providing the balance of the funding.

34.     Medicare is the nation's health program for persons over 65 and the disabled. Medicare is funded by the Federal Government.

8

35.     Under the Medicare Act, 42 U.S.C. § 1395y(a)(1)(A), there is an express fundamental condition of payment: "no payment may be made [under the Medicare statute] for any expenses incurred for items or services which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury." This condition links each Medicare payment to the requirement that the particular item or service be "reasonable and necessary." Medicaid and other federally funded programs restrict coverage under the same principle.

36.     Medicare and the other federally funded programs require the submission of documented and properly coded claims which include the implied or express representation that the medical treatment, surgery or procedure was medically necessary.

## VII.   HOSPICE CARE

37.     When a Medicare (or other government health care) patient is diagnosed as being terminally ill with a prognosis of less than 6 months to live, he may elect to obtain hospice care instead of curative care.  42 C.F.R. §418.24.  This election, made by the patient after being advised of his rights, focuses on a family centered multidisciplinary approach to the process of death. The care is described as "palliative" which is defined in 42 C.F.R. §418.3(3) as:

> Palliative care means patient and family-centered care that optimizes quality of life by anticipating, preventing, and treating suffering. Palliative care throughout the continuum of illness involves addressing physical, intellectual, emotional, social, and spiritual needs and to facilitate patient autonomy, access to information, and choice.

All other Medicare benefits are waived during the time of the election and unless it is revoked. 42 C.F.R. §418.24.

38.     Federal Rules provide strict guidelines for Hospice providers, patients and care because the Medicare per diem payment is costly to the government: approximately $170 per day

9

per patient enrolled. 42 C.F.R. §418.301 *et seq.* These conditions of participation include a comprehensive assessment that identifies each potential patient's need for hospice care and services including the need for physical, psychosocial, emotional and spiritual care. 42 C.F.R. §418.52.

39.     Hospice rules provide and list the content requirements and time deadlines within which the initial comprehensive assessment must be completed. 42 C.F.R. §418.54. Rules also require updates of the comprehensive assessment by the hospice interdisciplinary group (in collaboration with the patient's attending physician, if any) which must consider changes that have taken place since the initial assessment. This reassessment must be completed at least every 15 days. 42 C.F.R. §418.54(d).

40.     The purpose of these and other Hospice laws, rules and regulations are to insure that *only* qualified patients are accepted by Hospice providers and patients who were initially assessed as eligible, but are later found to be or become ineligible, be converted to more conventional treatment and care providers. 42 C.F.R. §§418.22; 418.25; 418.26(a)(2) and (3).

41.     Recertification summaries must be completed by care providers every 60 days to document the need for continued hospice care.

42.     Each and every hospice care provider, as a condition of participation in the program, must comply with all federal, state and local laws and regulations related to the health and safety of patients. 42 C.F.R. §418.116.

43.     When a patient is no longer terminally ill, or fails to qualify because of philosophical opposition to the nature of hospice care or refuses to accept any of the provided services, Hospice care must be terminated and the patient discharged. 42 C.F.R. §418.26(a).

10

44.     General Inpatient Care is proper for patients *in crisis* with acute and unmanageable symptoms.

## VIII. SUBSTANTIVE CLAIMS

45.     For two decades Hope Hospice has provided hospice and other medical services to the Southwest Florida region. As Medicare and Medicaid payments for Hospice services grew, Hope Hospice expanded its facilities and services.

46.     Almost since its inception, Hope Hospice employed a liberal admissions policy which regularly admitted patients who did not meet federal and state criteria for hospice care. This included filling their care center beds by inappropriately placing patients in the most expensive hospice reimbursement category of General Inpatient Care (GIP). Although reimbursement rates vary somewhat geographically, Medicare pays about $150/day for routine home care while GIP costs approximately $650/day.

47.     Under this liberal admissions policy, many patients were admitted who, although ill and perhaps requiring some assistance with the activities of daily living, were not terminally ill with a prognosis of death within 6 months. In addition, based on the personal knowledge gained during her work as Director of Hospice Care, Relator estimates that at any given time about 40% of the Hope's GIP census included patients who did not meet federal and state eligibility for this highest level of care.

48.     Relator has reported her concerns about these improper practices to management of Hope Hospice including communications in a variety of emails in her possession.

49.     Relator has many examples of patients who were placed in GIP inappropriately. Of these, some did not meet federal criteria for routine home hospice care and at least two were admitted on a regular basis over a ten year period. Relator has another example of a patient who

11

was ultimately discharged after six years of hospice care.  Of these examples, many are "Friends of Samira."

50.     Relator states that the following are examples of hospice patients who were improperly admitted, retained or placed in GIP care and who will be discussed in greater detail in the written Disclosure:

    A.    WC;

    B.    SS;

    C.    WW;

    D.    EF;

    E.    JE;

    F.    TJ;

    G.    EB;

    H.    LH;

    I.    PP;

    J.    BM;

    K.    MD;

    L.    RP

51.     A former full-time doctor at the Cape House, the largest HH inpatient facility, routinely protested the improper admission and retention practices.  She now works part time for HH and told the Relator, "You know how dishonest they are.  You have enough information.  Why don't you report them to the government? "

52.     SB frequently told Relator that "Hospice patients who are dying all deserve to be GIP, no matter how long they have to live."

53.     Patients were admitted who did not want to forego curative medicine and who wanted to continue treatment to prolong their lives.   These patients did not meet hospice eligibility criteria.

54.     There was pressure on staff to meet ambitious admission quotas and, as a result patients were admitted who did not meet Medicare/Medicaid criteria.   Once admitted, there was even greater pressure to retain patients whose conditions had improved or who were, in fact, ineligible for hospice when they were admitted.

55.     Nurses have complained to Relator that the pressure to meet "admission quotas" corrupted the admission process.

56.     Once admitted, it was extremely difficult to discharge a patient, even when it was clear that he/she should not be receiving hospice services.   Staff was afraid to recommend discharge for any patient since SB made it clear that she did not want to discuss discharge or discharge planning, particularly for FOS.

57.     Patient records were falsified to justify the retention of hospice inappropriate patients. Copying and pasting clinical findings from earlier examination records was common.

58.     A review or audit of patient files will reveal that there was no justification for the admission or retention of many patients.   The files are laden with "creative" misrepresentations directed by management in order to "meet" federal and state regulations.

59.     Dr. Felicia Stonedale is a former Medical Director at HH who now lives in Texas. Dr. Stonedale currently works part time approving HH admissions *long distance*.   She was originally a team doctor when Relator started and soon took over as Medical Director.   Dr. Stonedale would frequently complain to Relator about how illegal everything was that they were

doing.  She left for Texas after about one year.  She recently told Relator that she was coming to Florida to help train HH doctors and asked her "if anything had changed."

60.     A former doctor at Hope Hospice, who now works at Shell Point Retirement Community in Ft. Meyers, FL, is also aware of the fraudulent admission and retention practices. When Relator started work at HH this doctor told Relator: "They will eat you alive.  Most everything they do there is illegal and you won't be able to stand it."

61.     A former doctor at Hope Hospice was forced to leave because he loudly protested the inappropriate admission and retention practices.

62.     A former doctor left Hope Hospice after four months because he refused to "pad" patient charts to make it look as though they were declining.

63.     The former Quality Officer at Hope Hospice left about two years ago after complaining to SB about improper admission and retention practices.  SB decided not to fill the position.

64.     Dr. Charles Newton, the doctor at Bonita House, has told Pat Svec, the Bonita House Manager, to "find a reason" to improperly place patients into GIP status.  Because of her concerns over these improper admission and retention practices, Svec recently left HH to work at Promise Hospital in Ft. Meyers, FL.

65.     HH routinely admits patients into GIP if there is no willing caretaker at home or if, in SB's opinion, there is an "unsafe" environment at home.  HH improperly charges the highest in-patient reimbursement rates for these patients,

/ / /

/ / /

/ / /

## IX.   CAUSES OF ACTION

### COUNT I

### FALSE CLAIMS ACT
### FALSE CLAIM FOR PAYMENT OR APPROVAL
### 31 U.S.C. §3729(a)(1)(A) and (C) (2010)

66.     Relator repeats and realleges each allegation contained in paragraphs 1 through 65 above as if fully set forth herein.

67.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

68.     The Corporate Defendants, by and through its officers, agents, employees, related companies, subsidiaries and holding companies and Samira Beckwith,  knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A)(2010).

69.     The Corporate Defendants, by and through its officers, agents, and employees, and Samira Beckwith authorized and encouraged the actions of its various officers, agents, and employees to take the actions set forth above.

70.     As a result of the acts of Defendants, the United States Government reimbursed the Defendants and other physicians and hospitals for medically unnecessary hospice care, services, and per diems that it otherwise would not have paid.

71.     Every statement, billing and claim for payment submitted to the federal health insurance programs for each and every hospice patient who was not terminally ill with a prognosis of six months or less to live, if the illness runs its usual course or retained in hospice care after recovery, substantial improvement and a new prognosis or who was otherwise disqualified from hospice care represents a false or fraudulent claim for payment.

72.     By reason of Defendants' acts the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.  Federal health insurance programs have paid for thousands of days of hospice care and costs that they otherwise would not have paid for but for Defendant' fraudulent and illegal conduct.

73.     As set forth in the preceding paragraphs, Defendants have knowingly violated 31 U.S.C. § 3729 *et seq.* and have thereby damaged the United States Government.  The United States is entitled to three times the amount by which it was damaged, to be determined at trial, plus a civil penalty of not less than $5,500 and not more than $11,000 for each false claim submitted, paid or approved.

WHEREFORE, Relator respectfully requests this Court enter judgment against Defendants, as follows:

(a)     That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims alleged within this Complaint, as the Federal Civil False Claims Act, 31 U.S.C. § 3729 *et seq.* provides;

(b)     That civil penalties of $11,000 be imposed for each and every false claim that Defendant caused to be presented to the Government Healthcare Programs under the Federal False Claims Act;

(c)     That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d)     That the Relator be awarded the maximum amount allowed pursuant to the Federal False Claims Act; and

(e)     That the Court award such other and further relief as it deems proper.

/ / /

/ / /

16

## COUNT II

### FALSE CLAIMS ACT
### FALSE RECORDS OR STATEMENTS
### 31 U.S.C. §3729(a)(1)(B) and (C) (2010)

74.     Relator repeats and realleges each allegation contained in paragraphs 1 through 65, above as if fully set forth herein.

75.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

76.     The corporate Defendants, by and through its officers, agents, employees, related companies, subsidiaries and holding companies and Samira Beckwith, knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(B) (2010).

77.     As set forth in the preceding paragraphs, Defendants' provision of hospice care to unqualified patients defrauded the United States by getting false and/or fraudulent Medicare and other Government health care claims paid in violation of 31 U.S.C. § 3729(a)(1)(C) (2010).

78.     The Corporate Defendants, by and through its officers, agents, and employees, and Samira Beckwith authorized and encouraged the actions of its various officers, agents, and employees to take the fraudulent actions set forth above.

79.     As a result of the acts of Defendants, the United States Government reimbursed Defendants for hospice care that it otherwise would not have paid.

80.     Every statement, billing and claim for payment submitted to the federal health insurance programs for each and every patient who received hospice care which failed to meet the admission and retention rules and criteria was medically unnecessary and represents a false or fraudulent statement.

81.     By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

82.     As set forth in the preceding paragraphs, Defendants have knowingly violated 31 U.S.C. § 3729 *et seq.* and has thereby damaged the United States Government.   The United States is entitled to three times the amount by which it was damaged, to be determined at trial, plus a civil penalty of not less than $5,500 and not more than $11,000 for each false claim submitted, paid or approved.

WHEREFORE, Relator respectfully requests this Court enter judgment against Defendants, as follows:

(a)     That the United States be awarded damages in the amount of three times the damages sustained by the U.S. because of the false claims alleged within this Complaint, as the Federal Civil False Claims Act, 31 U.S.C. § 3729 *et seq.* provides;

(b)     That civil penalties of $11,000 be imposed for each and every false claim that Defendant(s) caused to be presented to the Government Healthcare Programs under the Federal False Claims Act;

(c)     That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d)     That the Relator be awarded the maximum amount allowed pursuant to the Federal False Claims Act; and

(e)     That the Court award such other and further relief as it deems proper.

/ / /

/ / /

/ / /

/ / /

## COUNT III.

### FLORIDAFLORIDA FALSE CLAIMS ACT
**Florida Statute § 68.081**

83.    Relator, acting in the name of and on behalf of the State of Florida, restates and realleges each and every allegation contained in paragraphs 1 through 65 above as if each were stated herein in its entirety and said allegations are incorporated herein by reference.

84.    This is a claim for treble damages and penalties under the Florida False Claims Act.

85.    By virtue of the acts described herein, Defendants, for the purpose of defrauding the Florida State Government, knowingly presented, or caused to be presented  false or fraudulent claims for payment or approval under Medicaid and other Florida State funded programs, and made, used and caused to be made and used false records and statements material to false claims.

86.    Each claim for payment for an inadmissible hospice patient, or a patient who no longer qualified for hospice care or whose records were falsified represents a false or fraudulent claim for payment.

87.    Each claim for payment for hospice care that contained false, inaccurate or deceptive billing codes or other false statements constitutes a false or fraudulent claim because such false claims are not covered by the Florida Medicaid program and other State health care programs.

88.    The State of Florida, by and through the Florida Medicaid program and other State health care programs, was unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants and paid and continues to pay the claims that would not be paid but for Defendants' wrongful actions and omissions.

89.     As a result, Florida state monies were lost through payments made in respect of the claims and other costs were sustained by the Florida State Government.

90.     Therefore, the Florida State Government has been damaged in an amount to be proven at trial.

91.     Additionally, the Florida State Government is entitled to the maximum penalty of $10,000 for each and every false and fraudulent claim made and caused to be made by Defendants and arising from Defendants' conduct as described herein.

92.     Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Florida Statute § 68.081 on behalf of herself and the State of Florida.

93.     This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Florida in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court enter judgment against Defendants, as follows:

    (a)    That the State of Florida be awarded damages in the amount permitted by law;

    (b)    That civil penalties of $11,000 be imposed for each and every false claim that Defendant caused to be presented to the State's Medicaid or other Government Healthcare Programs under the Florida False Claims Act;

    (c)    That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

    (d)    That the Relator be awarded the maximum amount allowed pursuant to the Florida False Claims Act; and

    (e)    That the Court award such other and further relief as it deems proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of Federal Rules of Civil Procedure, Plaintiffs and Relator hereby demand a trial by jury.

Dated: January 4, 2016                    Respectfully submitted,

Mark Schlein, Trial Counsel
Florida Bar No. 0000700
Diane Marger Moore
Florida Bar No. 268364
BAUM HEDLUND ARISTEI & GOLDMAN, P.C.
12100 Wilshire Blvd., Suite 950
Los Angeles, CA 90025
Tel: 310-207-3233
Fax: 310-207-4204
mschlein@baumhedlundlaw.com

*Attorneys for Relator*
*Margaret Peters, R.N.*

21